**JACKSON v. JACKSON et al.**[*]

No. 880.

Circuit Court of Appeals, Tenth Circuit.

Nov. 28, 1933.

Warwick M. Downing, of Denver, Colo. (W. L. Ransom, of Sapulpa, Okl., on the brief), for appellant.

A. S. Norvell, of Wewoka, Okl., and L. G. Owen, of Tulsa, Okl. (Spencer Norvell and W. M. Haulsee, both of Wewoka, Okl., on the brief), for appellees.

Before LEWIS and BRATTON, Circuit Judges, and SYMES, District Judge.

BRATTON, Circuit Judge.

The oil-bearing land involved in this case was allotted to Raymond Jackson, a Seminole freedman born about 1903. He left his home in Seminole county, Okl., late in October, 1921. His father, acting as his guardian, on January 2, 1923, executed an oil and gas lease covering the premises to E. W. Whitney. It was subsequently assigned to The Carter Oil Company. Oil was discovered in 1928. A search was made for Raymond. It developed that a boy or young man had been killed on a railway near Blue Mountain, Ark. After investigation, the body was exhumed and accepted by his father as that of

*Rehearing denied January 8, 1934.

Raymond. Litigation followed. A suit was filed by a person residing in California, alleging that he was Raymond Jackson, the allottee; another proceeding was begun by Vivian Jackson, asserting that she was the surviving widow of Raymond Jackson, the allottee, then deceased, of Colorado. Plaintiff in each case prayed appropriate relief. Appellant instituted an action, likewise alleging that he was the allottee. He sought to recover the land and prayed that the Carter Oil Company be required to account for the minerals taken therefrom. The several cases were consolidated for trial. Davis A. Jackson, Rhina Jackson, A. S. Norvell, and R. S. Norvell intervened in the consolidated case. The two Jacksons alleged that they were the parents of Raymond Jackson, the allottee; that he was dead; that they were his sole heirs at law; that they owned the surface of the land and an undivided one-half of the minerals therein. The two Norvells alleged that they owned the other half of the minerals, having acquired the same from the Jacksons. They all contended that the oil and gas lease held by the Carter Oil Company was void because it was executed by Davis A. Jackson, as purported guardian of Raymond, to E. W. Whitney subsequent to Raymond's death. Interveners and The Carter Oil Company subsequently composed their differences and interveners ratified such oil lease, thus eliminating that question.

The case was submitted to the court. The trial consumed about three weeks' time. The court found that Raymond Jackson, the allottee, was killed and died at Blue Mountain, Ark., on or about November 8, 1921; that he was then nineteen years of age; that he had never married and died without issue; that his father and mother were his sole heirs at law and inherited the land upon his death; that they owned the surface rights of the land and one-half of the mineral rights; that the two Norvells owned the other half of the mineral rights; that the so-called Raymond Jackson of Colorado was not the allottee and that Vivian Jackson was not the surviving widow of the allottee; that the so-called Raymond Jackson of California was not the allottee; and that appellant, commonly called the Kentucky Raymond Jackson, was not the son of Davis A. Jackson and Rhina Jackson and that he is not the allottee. An appropriate decree was entered quieting the title of Davis A. Jackson and Rhina Jackson to the surface of the land and quieting title of the two Jacksons and the two Norvells to the minerals, all subject to the mineral lease of The Carter Oil Company, also canceling certain instruments

and making proper disposition of all parties. Appellant alone appealed.

We proceed to consider the case on its merits. That involves the single question whether appellant is the allottee and consequently the owner of the land. It is a question of identity. The burden rests upon appellant to establish that fact. It is conceded that the allottee, son of Davis A. Jackson and Rhina Jackson, lived in the home of his parents near Wewoka, Okl.; that he left his home in October, 1921, at the age of eighteen and one-half years, with a neighbor boy named Willie Rainey. The events transpiring after that time give rise to controversy. Appellant testified that after leaving home he went to Boley, then to Bristow, then to a town in Missouri, then to Helena, Ark., then to Martin, Tenn., then to Fulton, Ky., where he resided about two years and five months, and from there to Chicago, where he stayed until he returned to Oklahoma in 1929; that he left home because his father struck him on the head, inflicting an injury from which he suffered three or four years. Davis and Rhina Jackson each testified that appellant was not their son; two of their sons testified that he was not their brother; Roxie, a daughter, testified that Raymond left home in October, 1921, and that she had never seen him since. A score of witnesses residing in Wewoka and vicinity for many years testified that they had known the Jackson family; that they knew Raymond when he was a boy. Some testified positively that appellant was that Raymond; others with equal opportunity to know testified with an equal degree of positiveness that he was not. Several persons residing in Fulton, Ky., testified positively that appellant was reared there; that he was the son of Israel Jackson and Mollie Jackson. Some of them were near neighbors of the Jacksons and said they had known Raymond since he was a baby; he had worked for some of them. Dick Thomas, engaged in trading, farming, and renting houses, said that Israel Jackson lived on his place and worked for him several years; that Raymond was reared there; that his residence was about three hundred yards from that of the Jacksons. He identified appellant as the person about whom he testified. C. C. Reed testified that he had lived just across the road from Missionary Bottom, a colored section of the town of Fulton, all his life; that the Reed family owned a number of rent houses; that Israel Jackson collected rent for them; that he had known Raymond all his life; that he was the supposed son of Israel; that he

was reared in Fulton; and that he was about thirty-five years. He, too, identified appellant as the person about whom he testified. Others testified that appellant was reared in Fulton. The testimony is direct and substantial, and carries conviction.

There can be no doubt that a young man about the age of the allottee was killed accidentally on November 8, 1921, about three weeks after the allottee left his home in Oklahoma. The body was found on the railway track severed at the waist line. The deceased at the time of his death wore overalls and a jumper with a dress suit underneath. The label on the coat of the dress suit bore the words, "R. Jackson, Progress Tailoring Company, Chicago," also serial number 446,965. The label was removed and preserved by the coroner; it was delivered to his successor and was introduced in evidence. A cotton gin ticket issued to R. Jackson, Shawnee, Okl., was found in the pocket of the deceased. It was not preserved, but many witnesses testified positively to its existence. It appears from several witnesses and without contradiction that the allottee purchased a suit from Progress Tailoring Company some time before he left home. There is some conflict with respect to the exact time, but it cannot be doubted that he purchased a suit from that company and that he was wearing it under overalls and a jumper when he left home. There is testimony indicating that the suit made by Progress Tailoring Company and bearing serial number 446,965 could not have been made until about 1923, but we regard that discrepancy as relatively unimportant, at least not controlling, when arrayed against the certainty that the allottee purchased a suit and was wearing it when he departed from home and that the coat found on the body of the deceased in Arkansas about three weeks later was made by that company and bore the name R. Jackson.

Appellant had known J. H. Hart at Fulton, Ky.; also Heber Finch, one of his attorneys of record. Finch was prosecuting attorney there when appellant was placed in jail. Finch moved to Oklahoma before this litigation began. Appellant received a telegram from Hart, as follows:

"Raymond Jackson, 4534 State Street, 3 Flr. Chicago. This property is in Oklahoma coming to you. J. H. Hart."

He testified that he did not know what the telegram meant and that he did not write Hart. Hart, Finch, and Hall, an attorney in Chicago, came to see him in Chicago and

later Finch and Hall came with him to Tulsa. Hall soon withdrew from the matter and Finch withdrew from the case, after some of the witnesses came from Fulton to Muskogee for the purpose of identifying appellant as the Raymond Jackson born and reared in Kentucky. A circumstance worthy of consideration is that when appellant came to Oklahoma in 1929, accompanied by attorneys, and without any suggestion or intimation disclosed by the record that Davis and Rhina Jackson would disown or repudiate him, whether moved by a desire to claim the land as their own or otherwise, he did not go to their home and attempt to reside and associate with them; instead, he took up his temporary abode with others in the county and apparently began to prepare for this litigation.

He displayed marked unfamiliarity at the trial with several matters of signal importance. He did not know how many sisters his mother had; he could not tell their names; he said he had gone to school in the neighborhood off and on for about twelve years, but he could give the names of only two or three teachers. A group photograph showing the student body of the school attended by the allottee was introduced in evidence. When asked by the court to name and point out the students, he said he could designate only his kinsmen. Upon being asked why he could not name other schoolmates, he said he was not responsible for other people—an obviously unsatisfactory answer calculated to arouse suspicion.

A photograph of appellant, taken after he came to Oklahoma in 1929, and about a year before the trial began, is contained in the record. It convinces us that he then was not less than thirty-five to forty years old; the allottee would have been about twenty-six years of age. The trial judge heard the case at length. He saw the witnesses and observed their demeanor; he had appellant stand with members of the Jackson family and after a close examination stated that he could see no physical resemblance. He made specific findings that the allottee was killed at Blue Mountain, Ark., in 1921; that appellant was not the allottee. While we review the facts, such findings are presumably correct and should not be lightly set aside. They should be vacated only in case of clear mistake in considering the evidence. Youngblood v. Magnolia Petroleum Co. (C. C. A. 10) 35 F.(2d) 578, Jonah v. Armstrong (C. C. A. 10) 52 F.(2d) 343. We have examined the record with great care and we think the findings are not only supported by substantial evidence, but we concur in the conclusion that appellant is an impostor; that the allottee was killed at Blue Mountain, Ark., and that upon his death, title to the land vested in his parents.

The judgment was correct and it is affirmed.